# STATE OF FLORIDA v BENSON
## Case No. 85-778-CFA-31-HDH
Twentieth Judicial Circuit, Collier County
September 13, 1985

## APPEARANCES OF COUNSEL

**Jerry Brock,** Office of the State Attorney, for plaintiff.
**Michael R. N. McDonnell** for defendant.

## OPINION OF THE COURT

HUGH D. HAYES, Circuit Judge.

THIS CAUSE came on for hearing on Monday, the 9th day of September, 1985 based upon the Defendant's Motion for Setting of Bail. *THE MOTION IS DENIED*, upon the authority of *State v. Arthur*, 390 So.2d 717 (Fla. 1980).

On the 6th day of September, 1985, the Grand Jury of Collier County, by a 16-0 vote, presented a True Bill indicting and charging

the Defendant with nine felonies; four of which were capital felonies or felonies punishable by life imprisonment. A copy of said True Bill is attached hereto and incorporated herein by reference. Essentially, these charges arose out of the car bombing of the Defendant's mother's motor vehicle while it was parked outside of the Defendant's mother's residence, and while it was occupied by the Defendant's mother, Margaret H. Benson, now deceased; the Defendant's brother, Scott Benson, now deceased; and the Defendant's sister, Carol Benson Kendall, who is currently recovering from the injuries sustained in the blast.

The Defendant has alleged that he is entitled to bail in this case in accordance with Article 1, Sec. 14 of the Florida Constitution 1885, and Florida Rule of Criminal Procedure 3.131. Article 1, Sec. 14 of the Florida Constitution of 1885 states:

> *Bail.* Until adjudicated guilty, every person charged with a crime or violation of municipal or county ordinance shall be entitled to release on reasonable bail with sufficient surety unless charged with a capital offense or an offense punishable by life imprisonment and the proof of guilt is evident or the presumption is great.

Likewise, Florida Rules of Criminal Procedure 3.131(a) contains the same language except it also contains a provision that:

> . . . If no conditions of release can reasonably protect the community from risk of physical harm of persons, assure the presence of the accused at trial, or assure the integrity of the judicial process, the accused may be detained.

The Defendant cites the cases of *Russell v. State*, 71 So. 27 (Fla. 1916), *State v. Williams*, 87 So.2d 45 (Fla. 1956), and *Mininni v. Gillum*, Case No. 85-1533 (2d DCA Fla., June 1985), 10 FLW 1954, as support for the proposition that Defendant is entitled to bail because the proof of guilt is not evident nor is the presumption great, and most emphatically, that the degree of proof necessary before bail can be denied, i.e., a greater degree of proof than that to establish guilty beyond a reasonable doubt, is lacking.

The State, on the other side, argues that the standards and burdens required to be met for the denial of bail have clearly and most recently been established by the Florida Supreme Court in *State v. Arthur*, 390 So.2d 717 (Fla. 1980). Since the trial court agrees that *Arthur* is controlling, we shall look to the requirements and standards that must be established pursuant to Chief Justice Boyd's opinion. (Later in this Opinion, the court will address in an Addendum some problem areas it

104

believes have risen based upon earlier court decisions in attempting to define "proof evident or presumption great").

Until the *Arthur* opinion in 1980, the rule in Florida had been that in a bail proceeding, the indictment was not conclusive of the Defendant's guilt, but the burden of proof was on the accused to show that the proof was not evident nor the presumption great. *Russell v. State*, 71 So. 27 (Fla. 1916). However, Judge Anstead, writing the Opinion for the 4th District Court of Appeals in *Arthur v. Harper*, 371 So.2d 96 (4 DCA Fla. 1978), now *Arthur v. State*, supra, successfully demonstrated that based upon the reasoning in the case of *Escander v. Ferguson*, 441 F. Supp. 53 (S. D. Fla. 1977) that if Section 14 of Article 1 was interpreted in such a way as to leave the trial court with no discretion to grant bail *in life felony cases* (emphasis added), as a minority of states still do, when the proof is evident, it might be violative of the equal protection and due process provisions of the federal constitution. But see *Steigler v. Superior Court of New Castle County*, 252 A.2d 300 (Del. 1969), cert. den. 396 U.S. 880, 24 L. Ed. 2d 139, 90 S.Ct. 160 (1969), where the Delaware Supreme Court had ruled a Defendant's constitutional rights under the Eighth and Fourteenth Amendments of the United States Constitution were not violated by a constitutional provision that all prisoners shall be bailable, except when the offense is *capital* (emphasis added), and proof is positive or presumption is great.

Nevertheless, the Florida Supreme Court in *Arthur* has apparently taken the position, without distinguishing life felony from capital offense, that the state must come forward with a showing that the proof of guilt is evident or the presumption is great. *Arthur*, supra at p. 720. The Florida Supreme Court then went on to basically explain the standard as to how the State can meet this initial burden and establish that the proof is evident or the presumption is great, when at p. 720, it continued:

. . . The State's burden, in order to foreclose bail as a matter of right, is to present some further evidence which, viewed in the light most favorable to the state, would be legally sufficient to sustain a jury verdict of guilty

. . . The state can probably carry this burden by presenting the evidence relied upon by the grand jury or the state attorney in charging the crime.

The Court then goes on to say that this evidence can be presented in the form of transcripts or affidavits. The above outlined procedure was precisely what the state attorney has done with the case before the

**105**

court today in regard to Defendant, Benson. Admitted into evidence at the bail hearing and attached hereto and incorporated by reference herein are the Affidavit for Criminal Offense (Exhibit #1); the Affidavit For Search Warrant (Exhibit #2); Affidavit of Albert W. Gleason of the Explosives Technology Branch, Bureau of Alcohol, Tobacco and Firearms (Exhibit #3); and Affidavit of Frank G. Kendall, Latent Prints Examiner for the Bureau of Alcohol, Tobacco and Firearms (Exhibit #4), all of which are representative and accurate reproductions of the evidence presented to and considered by the Collier County Grand Jury.

After the State had presented their case in the above described manner, the State rested. The defense then stated that they had no witnesses to call or other evidence to present and they likewise rested. The Court concluded the hearing by advising counsel that it would take their arguments under advisement, and that the court felt more independent research was necessary before issuing a ruling.

Based upon the language and procedures established in *State v. Arthur*, it is quite clear and the Court does find that the State has met its burden and the Court does find that the proof of guilt is evident and the presumption is great.

Normally, even after the State has met its burden and established the requisite standard, the Court, after considering the Defendant's responsive showing, still has the discretion to grant or deny bail. However, on this issue, the burden is on the accused to demonstrate that release on bail is appropriate. This the Defendant has not done; and as the Court is at this time required to consider the evidence in a light most favorable to the state, there is no proper or legal basis for the Court to invoke its discretion and it refuses to so do. (Based upon the recommendation of denial of bail by the State Parole & Probation Department's ROR/Bond Reduction Investigation; the written pleadings of the surviving immediate relatives of the Defendant, excluding his wife, that he not be released on bail; the fact that the Defendant has no substantial ties to this community; considering the number and gravity of the charges and the potential sentences involved, the Defendant would appear to have had quite a burden to invoke the Court's discretion.)

IT IS SO ORDERED AND THE MOTION MUST BE DENIED.

### ADDENDUM TO OPINION

Regarding: ". . . the proof of guilt is evident or the presumption is great. . . ." Art. I, Sec. 14, Florida Constitution 1885.

106

This Court feels compelled to add this *Addendum to Opinion*, and to file it as an Addendum, not because it so directly involves or relates to the case at bar, but because after doing some research in this area (and I know "a little bit of knowledge is dangerous"—I too see it every day), this Court has become somewhat concerned and perplexed with the fact that at least from 1916 to arguably 1980, the state of Florida has utilized a principle of law regarding burdens and standards of proof with regard to bail hearings that seems not well founded and possibly initially influenced by the facts of the case, to wit: *Russell v. State*, 71 So. 27 (Fla. 1916). Respectfully, it is suggested for consideration that the axiom "bad facts make bad law" may have been applicable to the *Russell* case and the extremely formidable definition applied by that earlier court in electing to emphasize the word "evident", and totally omit or ignore any reference to the term "presumption".

In *Russell*, the Court, in its majority opinion, pointed out that the Defendant was on trial for the rape of a female and that this required that the crime be committed by force and against the female's will. The Court noted on Page 29 of the Opinion that the female's testimony carried with it its own contradictions and discrepancies, and that while the court was not willing to say that the evidence would not sustain a conviction of guilt, they did think that the Defendant had met his burden of proving that the proof of guilt was not evident or the presumption great.

At first blush, the term ". . . proof of guilt is evident or the presumption is great", would seem to be a rather logical thought or idea. However, as discussed by the 1916 Court, this term was defined in headnote #4 on page 28 as: ". . . a greater degree of proof than that establishing guilt merely to the exclusion of a reasonable doubt." *Russell*, supra p. 28.

The *Russell* court then went on to define the word "evident" by referring to Webster's dictionary which defined it as "clear to the understanding and satisfactory to the judgment." *But*, the Court then went to the synonyms: "Manifest, plain, clear, obvious, conclusive", and chose to use the word "manifest": *to put beyond question of doubt* (emphasis added). The Court, thus, essentially, adopted this definition as the standard or the burden of proof which must be met. Essentially and arguably, the constitutional term was now ". . . proof of guilt is 'manifest' or the presumption is great". This was not a good idea.

Considering that such a judicial interpretation was being given in 1916 to such a constitutional term in an 1885 Constitution, and

**107**

conceding for argument's sake that the intent was to provide a greater protection to the citizen through the constitution than he had been previously provided at common law, one still must ask why the Court so obviously chose to omit the second part, i.e., the "presumption" part of the constitutional language. Maybe they did so intentionally. Had they utilized the same Webster's dictionary for "presumption" they would not have had to use a synonym for their definitional standard, as they did in the definition of "evident". Indeed, Webster's had then and has now a specific *Law* definition: "An inference as to the existence of one fact not certainly known, from the known existence of some other fact". However, the strength of this definition would not have sustained the 1916 court's terminology of "a greater degree of proof than that establishing guilt merely to the exclusion of a reasonable doubt". No, the utilization of the actual definition of "presumption" would neither have created such a strict standard nor such a strict burden of proof, and concomitantly, would not have established the legal maze we are now attempting to understand and ferret through.

Well, the question must be asked, are "evident" and "presumption" two inconsistent or mutually exclusive terms; are they unfortunately loosely commingled by lawyers and judges like "assault and battery" or "search and seizure"? Probably so, even though, at least to the last two clauses, the courts have properly educated the lawyers, if not the public, that they are separate and distinct terms.

Ironically, even though the Florida Supreme Court still uses the full constitutional phrase, ". . . evident or the presumption is great", Judge Anstead, writing for the 4th DCA in the lower *Arthur* decision, only used the term "evident" in his text and never appears to have used "presumption is great". Reliance on such a stringent definition has obviously led to some rather stringent and strange interpretations, like *Gardner v. Murphy*, 402 So.2d 525 (5th DCA Fla. 1981), which even the 4th DCA (again Judge Anstead writing) in *Harp v. Hinckley* 410 So.2d 619 (4th DCA Fla. 1982), refused to fully embrace or adopt.

## CONCLUSION TO ADDENDUM

There seems to be some persuasive argument and evidence that the phrase ". . . proof of guilt is evident or the presumption is great", may have some inconsistencies within its definition, especially as historically applied by previous Florida supreme courts. For some unknown reason, the earlier supreme court elected to take a more derivative definition of one term contained in the clause, and yet, apparently, it knowingly and wilfully rejected an acceptable law definition of a

108

concomitant sister term. This has for seventy years, led to an overly stringent application of the definitions and some rather strange and difficult to explain or comprehend concepts vis-a-vis the "body politic".

There are no United States nor Florida constitutional prohibitions in utilizing the "presumption" definition for this phrase, and the resultant interpretation and application with regard to bail proceedings will be much more consistent and uniform with societal needs as well as jurisprudential understanding and application. Thus, if the Florida Supreme Court is considering a differentiation or closer historical scrutiny of the application of Section 14, Article I of the Florida Constitution of 1885, it is respectfully suggested that it be in line with some of the comments made herein.

DONE AND ORDERED in Naples, Collier County, Florida, this Friday, the 13th day of September, 1985.

IN THE CIRCUIT COURT FOR THE TWENTIETH JUDICIAL CIRCUIT FLORIDA COLLIER COUNTY, FALL TERM IN THE YEAR OF OUR LORD, ONE THOUSAND NINE HUNDRED AND EIGHTY FIVE

85778CFA31HDH

THE STATE OF FLORIDA )
)
)
)
vs. )
)
)
STEVEN WAYNE BENSON )
)

INDICTMENT FOR:

COUNT I: FIRST DEGREE MURDER
COUNT II: MAKING, POSSESSING, THROWING
 PLACING OR DISCHARGING ANY
 DESTRUCTIVE DEVICE RESULTING IN
 THE DEATH OF ANOTHER
COUNT III: FIRST DEGREE MURDER
COUNT IV: MAKING, POSSESSING, THROWING
 PLACING OR DISCHARGING ANY
 DESTRUCTIVE DECIVE RESULTING
 IN THE DEATH OF ANOTHER
COUNT V: ARSON
COUNT VI: ARSON RESULTING IN INJURY
COUNT VII: ARSON RESULTING IN INJURY
COUNT VIII: ARSON RESULTING IN INJURY
COUNT IX: ATTEMPTED FIRST DEGREE MURDER

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF FLORIDA:

The Grand Jurors of the State of Florida, empaneled and sworn to inquire and true presentment make, in and for the County of Collier, upon their oath do present that STEVEN WAYNE BENSON, of the County of Collier and State of Florida, on the 9th day of July, in the year of our Lord, One Thousand, Nine Hundred and Eighty Five, in the County and State aforesaid,

### COUNT I

did unlawfully from a premeditated design to effect the death of a human being kill and murder Margaret H. Benson, a human being, by the use of an explosive device, in violation of Florida Statute 782.04.

### COUNT II

did unlawfully make, possess, throw, place, discharge or attempt to discharge a destructive device with the intent to do bodily harm to a person or with the intent to do damage to property and such act resulting in the death of another person to-wit: Margaret H. Benson, in violation of Florida Statute 790.161.

### COUNT III

did unlawfully from a premeditated design to effect the death of a human being kill and murder Scott Benson, a human being, by the use of an explosive device, in violation of Florida Statute 782.04.

### COUNT IV

did unlawfully make, possess, throw, place, discharge or attempt to discharge a destructive device with the intent to do bodily harm to a person or with the intent to do damage to property and such act resulting in the death of another person to-wit: Scott Benson, in violation of Florida Stataute 790.161.

### COUNT V

did unlawfully, willfully, and maliciously, by fire or explosion, damage a structure located in the vicinity of 13002 White Violet Drive, Quail Creek Subdivision, Naples, Collier County, Floirda, knowing or with reasonable grounds to believe that a human being was therein, in violation of Florida Statute 806.01(1).

### COUNT VI

did unlawfully, willfully, and maliciously, by fire or explosion, damage or cause to be damaged a structure, and said act resulted in great bodily harm, permanent disability or permanent disfigurement to another person, to-wit: Margaret H. Benson; in violation of Florida Statute 806.031(2).

110

090-ALY, Florida registration, which Steven parked in the driveway of 13002 White Violet Drive. The time was approximately 7:25 A.M. to 7:30 A.M. Steven Wayne Benson entered the residence of Margaret H. Benson, his mother's home located at 13002 White Violet Drive. Upon entering the residence Steven Wayne Benson met with Margaret H. Benson, his mother; Wayne Kerr, Margaret H. Benson's attorney; and Carol Lynn Benson Kendall, Steven's sister. Steven Wayne Benson remained in the residence for a short period of time, approximately 7:35 A.M. to 7:40 A.M., during this period advised those in the household that he was going to the Shop-N-Go, located on C.R. 846 (Immokalee Road), west of I-75, to get donuts and coffee. Steven Wayne Benson asked for the keys to the Suburban so as not to use the gas in his van. Steven Wayne Benson then exited the residence, got into the 1978 Chevrolet Suburban, and left the area. Approximately one hour and ten minutes later Steven Wayne Benson returned to the residence of 13002 White Violet Drive, parked the Suburban in the front circular driveway and entered the residence with coffee and sweet rolls. Approximately 9:10 A.M. to 9:15 A.M., Steven Wayne Benson exited the residence with Scott Benson, Margaret Benson and Carol Lynn Benson Kendall. Scott Benson got into the Suburban on the driver's side behind the steering wheel, Margaret H. Benson got into the front passenger side of the vehicle, and Carol Lynn Benson Kendall got into the left rear passenger side of the vehicle. Steven Wayne benson gave Scott Benson the keys to the vehicle and was about to go around the vehicle to get into the right rear passenger side when he stated there was something in the house he needed. Steven stated that he was standing near the vehicle when the vehicle exploded. Steven Wayne Benson then ran into the house to get help and have someone in the house call for help.

Your Affiant was advised by Steven Wayne Benson that when he left the residence to get coffee and donuts he went to the Shop-N-Go on Immokalee Road, west of I-75 interchange. While at the Shop-N-Go, Steven Wayne Benson stated he met someone from Sand Kastle Construction, and had conversation with him as Meridian Securities Network is doing work for Sand Kastle Construction. Steven Wayne Benson advised that is why it took so long between the time he left his mother's residence and returned.

Your Affiant spoke to the two (2) owners, of Sand Kastle Construction who advised that they did not speak with Steven Wayne Benson at the Shop-N-Go on Immokalee Road (C.R. 846) on July 9, 1985. A check of the company records

**111**

STATE OF FLORIDA vs. STEVEN WAYNE BENSON
STATE OF FLORIDA, COLLIER COUNTY

Personally came before me Lieutenant Harold Young, Collier County Sheriff's Department, Naples, Florida, who, being by me first duly sworn, deposes and says that on the 9th day of July, 1985, in Collier County, Florida, one STEVEN WAYNE BENSON, did commit TWO COUNTS - FIRST DEGREE PREMEDITATED MURDER, F.S. 782.04 and ONE COUNT - ATTEMPTED FIRST DEGREE MURDER, F.S. 777.04(4a). My probable cause being based upon the following facts:

1. On July 9, 1985, at approximately 9:18 A.M. two (2) explosive devices detonated inside a 1978 Chevrolet Suburban truck while it was located in the front driveway at the residence of Margaret H. Benson, 13002 White Violet Drive, Quail Creek Subdivision, Naples, Collier County, Florida. The detonation of the two (2) separate explosive devices resulted in the deaths of Margaret H. Benson, and Scott Benson, with Carol Lynn Benson Kendall being critically injured. All three (3) were occupants of the 1978 Chevrolet Suburban truck at the time of detonation of the two (2) explosive devices.

2. Your Affiant was notified on July 9, 1985, at approximately 9:20 A.M. of the explosions, deaths, and injuries that had occurred at 13002 White Violet Drive, Quail Creek Subdivision. Your Affiant immediately went to the scene and met with a Collier County Deputy Sheriff, who stated that an explosion had occurred and a Chevrolet Suburban truck was completely destroyed, and two (2) people had been killed, and one (1) injured. Your Affiant was further told that the injured, a female, had been transported to Naples Community Hospital by Emergency Medical Services, in critical condition.

3. Your Affiant, during the investigation at the scene spoke with white male Steven Wayne Benson, where the following was obtained: That on July 9, 1985, Steven arrived at the residence of 13002 White Violet Drive, Quail Creek Subdivision, driving a beige colored Chevy Van 20, Chevrolet, Tag Number

**112**

## COUNT VII

did unlawfully, willfully, and maliciously, by fire or explosion, damage or cause to be damaged a structure, and said act resulted in great bodily harm, permanent disability or permanent disfigurement to another person, to-wit: Scott Benson, in violation of Florida Statute 806.031(2).

## COUNT VIII

did unlawfully, willfully, and maliciously, by fire or explosion, damage or cause to be damaged a structure, and said act resulted in great bodily harm, permanent disability or permanent disfigurement to another person, to-wit: Carol Benson Kendall, in violation of Florida Statute 806.031(2).

## COUNT IX

did unlawfully from a premeditated design to effect the death of a human being attempt to kill and murder Carol Benson Kendall, a human being, by discharging or causing to be discharged an explosive device within or into a vehicle then occupied by Carol Benson Kendall, in violation of Florida Statute 777.04 and 782.04

---

A TRUE BILL

FOREMAN OF THE GRAND JURY

I, DELANO J. BROCK , Assistant State Attorney, Twentieth Judical Circuit of Florida, as authorized and required by law, have advised the

DELANO J. BROCK
Assistant State Attorney

---

Presented in Open Court by the Grand Jury and filed the 6th day of September, 1985.

WILLIAM J. REAGAN
CLERK OF THE CIRCUIT COURT

BY:

JOSEPH P. D'ALESSANDRO
State Attorney for the Twentieth Judicial Circuit of Florida

BY:
DELANO J. BROCK
Assistant State Attorney

lw:B:indictmen1

**113**

employee data indicate that no employees were in the area of the Shop-N-Go on Immokalee Road (C.R. 846) on July 9, 1985. Both owners of Sand Kastle Construction further stated to Your Affiant that they only spoke with Steven Wayne Benson reference to business dealings earlier this year, 1985.

4. Your Affiant was advised by an Investigator of the Collier County Sheriff's Department Homicide Division, that when interviewing Carol Lynn Benson Kendall at the hospital after the incident, she advised that Steven Wayne Benson gave the vehicle keys to Scott Benson, and was walking around the vehicle, when he stated that he (Steven Wayne Benson) had to go into the house to get a tape measure. Steven then ran toward the front entrance of the residence, as the first explosion occurred. Less than one minute later a second explosion detonated.

6. An agent within the U.S. Treasury Department and Bomb Expert, who was present during the physical examination of the crime scene and has examined pertinent evidence collected, stated that the explosive devices were pipe bombs, constructed by using a four inch by twelve inch galvanized metal "nipple" pipe, threaded on both ends, with galvanized metal end caps screwed onto the ends of the nipple. Said agent has also confirmed through laboratory examinations that the explosive material used was black powder.

7. Through interviews with various witnesses Your Affiant has learned that Scott Benson had driven the 1978 Chevrolet Suburban truck on July 8, 1985 and that as of 11:45 P.M. on July 8, 1985 there was no bomb located inside the console of the 1978 Chevrolet Suburban. A witness or witnesses further told Your Affiant that the above vehicle was parked in the driveway of the residence located at 13002 White Violet Drive, Quail Creek Subdivision and to said witnesses' knowledge no one had driven the vehicle from 11:45 P.M. on July 8, 1985 until driven by Steven Wayne Benson at approximately 7:35 A.M. on July 9, 1985. Your Affiant has also learned from witnesses present at the above residence that a well trained watch dog was present at the residence and gave no indication of the presence of an intruder in or about the premises during the night. The Suburban was parked on the premises.

The above mentioned bomb expert has concluded that one bomb was placed in the console between the two front seats in the Suburban truck. The second bomb was located under the left side of the rear seat where Carol Lynn Benson Kendall had been sitting.

■■■■■■■
■■■■■■

8. Your Affiant spoke with the owner of Abacus Security, which provides security for the subdivision, who stated that the Quail Creek Subdivision has twenty-four (24) hour private security by using marked patrol vehicles and a security gate manned twenty-four (24) hours daily. No intruders or any other suspicious person or trespassers in the area of 13002 White Violet Drive were reported to that security company on the evening of July 8 - 9, 1985.

9. Your Affiant has learned from interviews with other witnesses that on Friday, July 5, 1985, at approximately 3:25 P.M., a white male described as being approximately two-hundred (200) pounds and six feet (6') in height, having dark hair, wearing a dark blue plain baseball-type cap, and dark sunglasses purchased two (2) galvanized four inch (4") end caps from a local supply company. The white male had asked for four (4) four inch (4") metal end caps, but the employee stated they had in stock only two (2) four inch (4") metal end caps. On Monday, July 8, 1985, at 4:30 P.M. the white male subject returned and purchased two (2) four inch (4") by twelve inch (12") galvanized metal "nipple" pipes. This same type pipe has been identified by the above stated bomb expert as the type used in the bomb. The physical description of the individual purchasing the pipe i.e. weight, height, color or hair, matches the Defendant.

10. Your Affiant has learned from interviews of a witness or witnesses that several years prior to 1985 Steven Wayne Benson was observed in possession of copper tubings with wires protruding from the end and, after placing the same in a desired location, by the use of a remote control device caused the tube devices to explode.

11. Your Affiant furnished, to an auditor within the U.S. Treasury Department, bank records and accounts of Margaret H. Benson, Steven Wayne Benson, Meridian Security and Meridian Marketing. Your Affiant was later contacted by said agent who advised that preliminary findings from these records demonstrate that Steven Wayne Benson has been taking funds from his mother's (Margaret H. Benson) Dean Witter account and placing those funds into his personal checking account and into Meridian Security Network.

12. Your Affiant also learned from certain employees of Meridian Security Network that on July 5, 1985, the same day the pipe caps were purchased from the local supply company by an individual wearing a baseball type cap, Steven Wayne

**115**

Benson was asking employees for a hat to use or if there was a hat in the office. Steven Wayne Benson did not have a habit of wearing a hat and had never been observed by these employees wearing a hat.

13. Your Affiant has learned through the interview of various witnesses that:

A. Steven Wayne Benson obtained approximately two million dollars ($2,000,000.00) belonging to Margaret Benson for unauthorized purposes.

B. Because of the above-mentioned conduct, Margaret Benson contacted Wayne Paul Kerr, Esquire, her attorney. Ms. Benson asked Mr. Kerr to come to Naples, Florida for the purpose of removing Steven Wayne Benson from participation in various businesses owned or operated by Ms. Benson, and also to draft a will excluding Steven Wayne Benson from participation in her estate.

C. On the morning of July 9, 1985, Steven Wayne Benson drove the 1978 Chevrolet Suburban truck to obtain coffee and donuts at a Shop-N-Go on Immokalee Road (C.R. 846), approximately a five (5) minute drive from the Benson residence at 13002 White Violet Drive. Steven Wayne Benson was absent from the residence for about one hour. When he returned in the Suburban vehicle, he parked it to the left of the front door, where a wall obstructed its appearance from the door. When Scott Benson, Margaret Benson, Steven Wayne Benson, and Carol Lynn Benson Kendall exited the house, Scott Benson got in the driver's seat. Carol Lynn Benson Kendall got in the rear left seat. Steven Wayne Benson entered the right rear seat. Margaret Benson asked Steven to give Scott the ignition keys. Steven exited the vehicle on the right side. He walked around the vehicle to the driver's door and handed the keys to Scott Benson. At this time Steven stated he had to obtain some item from inside the residence. At that point Steven Wayne Benson ran toward the front door of the residence. Immediately after Steven Wayne Benson disappeared from sight behind the afore-mentioned wall, an explosive device inside the vehicle exploded, killing Scott Benson and Margaret Benson, and severely injuring Carol Lynn Benson Kendall. Approximately one minute later, a second explosive device inside the vehicle exploded.

**116**

SWORN TO AND SUBSCRIBED before me this 21st day of August, 1985.

_____
AFFIANT, LIEUTENANT HAROLD YOUNG

_____
NOTARY PUBLIC, COUNTY JUDGE, OR CIRCUIT JUDGE

IN THE CIRCUIT COURT FOR THE TWENTIETH JUDICIAL CIRCUIT IN AND FOR COLLIER COUNTY, FLORIDA.

STATE OF FLORIDA )
 ) SS: AFFIDAVIT FOR SEARCH WARRANT
COUNTY OF COLLIER )

 BEFORE ME, Judge ~~Hugh D. Hayes~~ *TED BROUSSEAV*, a Judge of the Circuit Court in and for the County of Collier, State of Florida, personally appeared Lieutenant Harold Young, Supervisor of the Crimes Against Persons Unit of the Collier County Sheriff's Department, who being duly sworn, deposes and says that he has probable cause to believe and does believe that on the body of white male Steven Wayne Benson, more particularily described as follows:

> A human being, having the given name of Steven Wayne Benson, caucasian male, having a date of birth of the twenty-sixth day of July, nineteen hundred and fifty-one. Steven Wayne Benson is approximately six (6) feet in heigth, approximately two-hundred pounds in weight, having dark brown hair, medium complexion. Attached hereto and made a part of is a black and white photograph depicting Steven Wayne Benson. Identified by Exhibit Number 1.

said body of Steven Wayne Benson being in Collier County or Lee County, State of Florida, there is now certain evidence to-wit: Rolled ink impressions of fingers, palms and writer's palm of both hands, necessary from the physical body of Steven Wayne Benson. Said evidence being germane to a violation of a Florida Statute; to-wit; First Degree Premeditated Murder, F.S. 782.04.

 YOUR AFFIANT hereby states that the facts to establish the grounds for this application and probable cause of Affiant believing that such facts exist are as follows:

 1. YOUR AFFIANT, Lieutenant Harold Young, began a Law Enforcement career in 1964, as a Police Officer in Miamisburg Ohio Police Department as a uniform patrolman. Then was promoted to Supervisor of Criminal Investigation Division, Miamisburg Ohio Police Department, where I maintained this position for three (3) years. During this period of time I attended numerous Law Enforcement Schools and Seminars, some being: Bureau Criminal Investigation London Ohio, Homicide School Concinnatti Ohio, Major Case Management School, Identification of the Unknown School, Crime Scene Technician School.

 In 1974, Your Affiant, started to work for the Collier County Sheriff's Department in the Correctional Division. Then was transferred to the Uniform Patrol Division, to a position of Deputy Sheriff, Road Patrol. In 1976, Your Affiant was promoted to the Criminal Investigation Division, with the rank of Corporal. Your Affiant was specifically assigned to the Crimes Against Persons Unit investigating Homicide, Robbery, Sexual Crimes and any crime against the person of another. Your Affiant was promoted to the rank of Lieutenant. Your Affiant has been the Supervisor for the Crime Against Persons Unit for eight (8) years.

 Your Affiant has investigated or supervised the investigation of approximately one-hundred-sixty (160) death investigation cases.

118

Your Affiant since 1974 has continued to attend schools and seminars some of those being, University of Louisville Homicide School in Orlando Florida, University of Louisville Homicide School - Naples, Florida, Blood Splatter School also University of Louisville - Naples, Florida.

2. On July 9, 1985, at approximately 9:18 A.M. two (2) explosive devices detonated inside of a 1978 Chevrolet Suburban truck while it was located in the front driveway at the residence of Margaret H. Benson, 13002 White Violet Dr., Quail Creek Subdivision, Naples, Collier County, Florida. The detonation of the two (2) separate explosive devices resulted in the deaths of Margaret H. Benson, and Scott Benson, with Carol Lynn Benson Kendall being critically injured. All three (3) were occupants of the 1978 Chevrolet Suburban truck at the time of detonation of the two (2) explosive devices.

3. Your Affiant was notified on July 9, 1985, at approximately 9:20 A.M. of the explosions, deaths, and injuries that had occurred at 13002 White Violet Dr., Quail Creek Subdivision. Your Affiant immediately went to the scene and met with Sergeant Roy Williams, Collier County Deputy Sheriff, who stated that an explosion had occurred and a Chevrolet Suburban truck was completely destroyed, and two (2) people had been killed, and one (1) injured. Your Affiant was further told that the injured, a female, had been transported to Naples Community Hospital by Emergency Medical Services, in critical condition. Also injured was a white male Fred Merrill, who had pulled Carol Lynn Benson Kendall away from the inferno.

4. Your Affiant, during the investigation at the scene spoke with white male Steven Wayne Benson, where the following was obtained: That on July 9, 1985, Steven arrived at the residence of 13002 White Violet Dr., Quail Creek Subdivision, driving a beige colored Chevy Van 20, Chevrolet, Tag Number 090-ALY, Florida registration, which Steven parked in the driveway of 13002 White Violet Dr. The time was approximately 7:25 A.M. to 7:30 A.M. Steven Wayne Benson entered the residence of Margaret H. Benson, his mother's home located at 13002 White Violet Dr. Upon entering the residence Steven Wayne Benson met with Margaret H. Benson, his mother; Wayne Kerr, Margaret H. Benson's attorney; and Carol Lynn Benson Kendall, Steven's sister. Steven Wayne Benson remained in the residence for a short period of time, approximately 7:35 A to 7:40 A.M., during this period advised those in the household that he was going to the Shop-N-Go, located on CR-846 (Immokalee Road), west of I-75, to get donuts and coffee. Steven Wayne Benson asked for the keys to the Suburban so as not to use his gas in his van. Steven Wayne Benson then exited the residence, got into the 1978 Chevrolet Suburban, and left the area. Approximately one hour and ten minutes later Steven Wayne Benson returned to the residence of 13002 White Violet Dr., parked the Suburban in the front circular driveway and entered the residence with coffee and sweet rolls. Approximately 9:10 A.M. to 9:15 A.M., Steven Wayne Benson exited the residence with Scott Benson, Margaret H. Benson, and Carol Lynn Benson Kendall. Scott Benson got into the Suburban on the driver's side behind the steering wheel, Margaret H. Benson got into the front passenger side of the vehicle, and Carol Lynn Benson Kendall got into the left rear passenger side of the vehicle. Steven Wayne Benson gave Scott Benson the keys to the vehicle and was about to go around the vehicle to get into the right rear passenger side when he stated there was something in the

**119**

house he needed. Steven stated that he was standing near the vehicle when the vehicle exploded. Steven Wayne Benson then ran into the house to get help and have someone in the house call for help.

Your Affiant was advised by Steven Wayne Benson that when he left the residence to get coffee and donuts he went to the Shop-N-Go on Immokalee Road, west of I-75 interchange. While at the Shop-N-Go, Steven Wayne Benson stated he met someone from Sand Kastle Construction, and had conversation with him as Meridian Securities Network is doing work for Sand Kastle Construction. Steven Wayne Benson advised that is why it took so long between the time he left his mother's residence and returned.

Your Affiant spoke to the two (2) owners, Steven Stalker and Al Richards, of Sand Kastle Construction who advised that they did not speak with Steven Wayne Benson at the Shop-N-Go on Immokalee Road (C.R. 846) on July 9, 1985. A check of the company records employee data indicate that no employees were in the area of the Shop-N-Go on Immokalee Road (C.R. 846) on July 9, 1985. Both owners of Sand Kastle Construction further stated to Your Affiant that they only spoke with Steven Wayne Benson reference to business dealings earlier this year, 1985.

5. Your Affiant was advised by Investigator Thomas B. Smith, Collier County Sheriff's Department Homicide Division, that when interviewing Carol Lynn Benson Kendall at the hospital after the incident, she advised that Steven Wayne Benson gave the vehicle keys to Scott Benson, and was walking around the vehicle, when he stated that he (Steven Wayne Benson) had to go into the house to get a tape measure. Steven then ran toward the front entrance of the residence, as the first explosion occurred. Less than one minute later a second explosion detonated. The 1978 Chevrolet Suburban was completely destroyed. Two occupants, Scott Benson and Margaret H. Benson, were instantly killed and one occupant, Carol Lynn Benson Kendall, was critically injured.

6. Your Affiant, designated members of the Collier County Sheriff's Department to the protection of the crime scene, those being Sgt. Roy Williams, Lt L. Wayne Graham, Sgt. Jim Gunderson, Deputy Paul McGee. Your Affiant designated the processing of the crime scene to Lt. Jack Gant, Sgt. Mike Gideon. Your Affiant requested the assistance of Cpl. Thomas A. Fife, Arson Investigator, Collier County Sheriff's Department. Your Affiant requested assistance of U.S. Treasury Division of Alcohol, Tobacco & Firearms and upon their arrival investigation began at approximately 11:30 A.l July 9, 1985 to process the crime scene. Agent George Nowicki, Alcohol, Tobacco & Firearms, Agent in charge coordinated their efforts with Your Affiant. Explosive Technician Al Gleason - Explosive Technology Branch, Washington, D.C., of the Alcohol, Tobacco & Firearms was assigned to the over all processing of evidence collected by Agents of Alcohol, Tobacco & Firearms, and members of the Collier County Sheriff's Department. The processing of the crime scene continued from July 9, 1985 until July 12, 1985, during which time Your Affiant requested and was furnished round the clock protection of the crime scene by Deputy Sheriff's.

7. On July 15, 1985, Agent Al Gleason advised Your Affiant that from the evidence collected, his preliminary findings were that the explosive devices were pipe bombs, constructed by using a four inch (4") x twelve inch (12") galvanized

**120**

metal "nipple" pipe, threaded on both ends, with galvanized metal end caps being screwed onto the ends of the "nipple". That the end caps had a marking of a "U" and a "G", which are markings used by U-Brand Company, for the "U" marking, and ITT-Grenell Company for the "G" marking. Agent Al Gleason further advised Your Affiant that until full laboratory examinations were made he would not be able to say what type of explosive material was used to place inside the galvanized metal "nipple" pipe. Agent Al Gleason advised Your Affiant that portions of a circuit-type board found at the scene appeared to be of a type used in alarm systems.

8. Your Affiant, spoke with Investigator Gene Brown, Collier County Sheriff's Department Homicide Division, who stated that Kim Beegle, Scott Benson's girlfriend, stated that Scott Benson had driven the 1978 Chevrolet Suburban truck on July 8, 1985; as she was with Scott Benson all day and with Scott Benson when he parked the vehicle at approximately 11:30 P.M. in the front drivway of the residence, 13002 White Violet Dr., Quail Creek Subdivision. She further stated that to her knowledge from midnight July 8, 1985 until the vehicle was driven by Steven Wayne Benson at approximately 7:35 A.M., July 9, 1985, no one else had driven the vehicle. Beegle further stated that a well trained dog belonging to Scott Benson was maintained inside the residence of 13002 White Violet Dr., for the main purpose of home protectior and that the dog had been with Scott and herself all day, July 8, 1985, when they had use of the 1978 Chevrolet Suburban and the dog had not "alerted" nor given any other signal that intruders were in the area. The Suburban was parked a distance of 20 to 30 feet from the front door of the residence all night.

Your Affiant has had no indication from surviving occupants of the residence that between the hours of midnight July 8, 1985 and the early morning hours of 7:25 A.M July 9, 1985 that the well trained dog gave any aggressive indications that anyone was about the residence.

Agent Gleason further advised that one pipe bomb had been in the console between the two front seats in the Suburban truck. That this bomb exploded in the console is consistent with the injuries to the bodies of Margaret H. Benson and Scott Benson. The second pipe bomb was located under the left side of the rear seat where Carol Lynn Benson Kendall had been sitting. Kim Beegle stated that no pipe bomb was in the console when she exited the Suburban truck at approximately 11:30 P.M., the night before, because she had to remove her pocketbook from inside the console at that time.

9. Your Affiant spoke to Ed Jessup, owner of Abacus Security, which provides security for the subdivision, who stated that the Quail Creek Subdivision has twenty-four (24) hour private security by using marked patrol vehicles and a security gate manned twenty-four (24) hours daily. No intruders or any other suspicious person or trespassers in the area of 13002 White Violet Dr. were reported to that security company the evening of July 8 - 9, 1985.

10. Your Affiant interviewed Gary Young, Manager of Shop-N-Go, located on C.R. 846, approximately one-tenth (1/10th) of a mile East of County Road 31, and that no one could identify

any person or person(s) coming to the store to purchase donuts and coffee on the morning of July 9, 1985.

11. Your Affiant spoke to Investigator Michael R. Koors, Collier County Sherff's Department Homicide Division, and Agent Terry Hopkins, Alcohol, Tobacco & Firearms, and was advised that on Friday, July 12, 1985, at approximately 4:30 P.M. during area canvassing, Hughes Supply Company, 3384 Progress Avenue, Naples, Florida, was entered and contact was made with employee Jeffery W. Maynes, who stated that on Friday, July 5, 1985, at approximately 3:25 P.M., a white male described as being approximatel two-hundred (200) pounds and six foot (6') in heigth, having dark hair, wearing a dark blue plain baseball-type cap, and dark sunglasses purchased two (2) U-Brand galvanized four inch (4") end caps. The white male had asked for four (4) four inch (4") metal end caps, but the employee stated they had in stock only two (2) four inch (4") end caps. The white male gave the employee the name Del-Ray Const-ruction, a nd signed the receipt in a scribbled handwriting manner, the purchase was for two (2) four inch (4") end caps U-Brand. On Monday, July 15, 1985, at 10:30 A.M. the white male subject returned and purchased two (2) four inch (4") x twelve inch (12") galvanized metal "nipple" pipe, such as Agent Gleason stated were used in the explosives.

Your Affiant was shown the original receipt, as it had been taken for evidence to see if latent prints could be obtained. Your Affiant was shown a composite which was made by Investigator Michael Koors, as directed by James Link who was the employee of Hughes Supply Company that completed the sale transaction with the previously described white male that purchased the two (2) end caps and two (2) four inch (4") galvanized metal "nipple" pipes. Attached hereto and made a partof is a copy of the composite depicting the description made by James Link of the white male who purchased the two (2) end caps and two (2) four inch (4") galvanized metal "nipple" pipe. Marked for identification as Exhibit Number 2. It is Your Affiant's opinion that the composite photo (Exhibit Number 2) is strikingly similar to Steven Wayne Benson as depicted in Exhibit Number 1.

12. Your Affiant was advised by Agent George Nowicki that he has been a Special Agent for the Bureau of Alcohol, Tobacco & Firearms of the U.S. Treasury Department for over eighteen (18) years. That during the eighteen years of employ-ment Agent Nowicki has attended more than twenty (20) schools and seminars on the Federal Level relating to Investigations of Alcohol, Tobacco & Firearms Violations, and several schools on Investigations of Explosive Incidents where all type of explosive devices are utilized. That during the eighteen years Agent Nowicki has personally investigated numerous cases where the use of explosives were used in the crime.

That Agent Nowicki has personally been aware of the Alcohol, Tobacco & Firearms investigations where the suspects fingerprints have been identified on documents that the suspect signed. The prints were discovered despite the fact that the forms had been handled by several other persons before the laboratory examination.

122

13. Your Affiant was advised by Investigator Michael Koors that on July 23, 1985 at approximately 3:30 P.M. an interview was held with Mr. Tom Schelling in Lancaster, Pennsylvania. Mr. Schelling stated that in 1982 he was employed at the Benson Estate in Lancaster, Pennsylvania. Mr. Schelling was working on the roof of the main house and during this time observed Steven Wayne Benson walking away from the house and in his hands were three (3) copper tubings approximately one inch (1") in diameter, length unknown. Mr. Schelling further observed that wires were protruding from the copper tubing. Mr. Schelling continued to observe Steven Wayne Benson as he walked toward the tennis courts. Mr. Schelling continued to watch Steven Wayne Benson until Steven Wayne Benson was out of Mr. Schelling's line of vision. A few moments later Mr. Schelling stated he heard three (3) explosions which were louder than M-80 type fireworks. Mr. Schelling further stated that after the explosions he got down off the roof and went to the tennis courts where he observed Steven Wayne Benson standing on the tennis courts holding a small black box that appeared to be the size of a remote garage door opener with two (2) push button switches, one (1) button was red and the other button white. Mr. Schelling stated that Steven Wayne Benson was laughing about what he had just done and walked away from Mr. Schelling without saying a word. Mr. Schelling looked around the tennis court and found no damage to the tennis court.

14. Your Affiant spoke to Wayne Kerr, Attorney-At-Law, who stated that he is the attorney for Margaret H. Benson and that he had left Philadelphia, Pennsylvania, on July 7, 1985 to come to Naples at Margaret H. Benson's request. Mr. Kerr stated that he was here under the pretense of doing the business taxes, but was actually here to go over the books and "pull the plug" out from under Steven Wayne Benson at the request of Margaret H. Benson. That on July 9, 1985 Mr. Kerr was at Margaret H. Benson's residence when the explosions occurred. Mr. Kerr advised that after the explosion he attempted to keep Steven Wayne Benson calm and assisted in getting emergency assistance for Scott Benson, Margaret H. Benson and Carol Lynn Benson Kendall.

15. Your Affiant requested the State Attorney Office, Twentieth Judicial Circuit to issue Subpoena's for bank records and accounts of Margaret H. Benson, Steven Wayne Benson, Meridian Securities, and Meridian Marketing. Upon receipt of those records Your Affiant requested the assistance of the U.S. Treasury Alcohol, Tobacco & Firearms, reference auditing those records. Mrs. Dianna Galloway, Senior Auditor of Alcohol, Tobacco & Firearms, Greensboro, North Carolina office, flew to Naples and met with Your Affiant. All records were turned over to Mrs. Galloway who took custody and control of said records, taking them back to Greensboro, North Carolina.

Your Affiant was later contacted by Mrs. Galloway who advised that preliminary findings from the records indicate that Steven Wayne Benson has been taking funds from his mother's (Margaret H. Benson) Dean Witter account and placing those funds into his personal checking account and into Meridian Securities Network.

Your Affiant was advised by Ms. Marty Taylor, Personal Secretary for Margaret H. Benson, and Ms. Brenda Turnbull, Secretary for Meridian Securities Network, that Margaret H. Benson had left two (2) checks from Dean Witter Account to be used to make payroll for Meridian Securities Network. Ms. Taylor and Ms.

**123**

Turnbull further ad ed Your Affiant that Steven Wayne Benson took the two (2) checks and wrote one (1) check for twenty-five thousand dollars ($25,000.00) to himself. The other check was written for fifty thousand dollars ($50,000.00) to Meridian Securities Network.

Mrs. Galloway, Senior Auditor for U.S. Treasury, Alcohol, Tobacco & Firearms, confirmed from her preliminary work on the records that the information to Your Affiant from Ms. Taylor and Ms. Turnbull reference to the aforementioned checks written by Steven Wayne Benson are a part of the records of Dean Witter, Steven Wayne Benson, and Meridian Securities Network checking accounts. From the records it was found that Steven Wayne Benson, after depositing the fifty thousand dollar ($50,000.00) check into Meridian Securities Network account, wrote a check from Meridian Securities Network account for twenty-five thousand dollars ($25,000.00) to himself.

16. Your affiant was advised by Lt. L. Wayne Graham of the Collier County Sheriff's Department and Agent George Nowicki of the U.S. Treasury Alcohol, Tobacco & Firearms that on July 26, 1985 they interviewed Carol Lynn Benson Kendall, at Massachusetts General Hospital in Boston, Massachusetts. Your Affiant received verbally from Lt. Graham and Agent Nowicki the content of the interview. Your Affiant has also read a transcribed document from the tape of said interview. The following are excerpts from the transcribed statement.

S.A. GEORGE NOWICKI: Could I ask you if your mother at any time expressed any fears to you about her own safety in regard to anybody in recent weeks?

CAROL BENSON KENDALL: My mother also, when she was in Lancaster, we were talking about, it wasn't exactly that my mother said that "I think Steven would kill me." it wasn't that kind of a statement but we were talking about the property that she was thinking of buying and she said something, "Steven would certainly perfer that I did it because it would, it would be more money for him if I were dead." I can't remember exactly but she did indicate, my mother did indicate to me that perhaps she would not put it past my brother to do away with her.

S.A. GEORGE NOWICKI: How long ago did she tell you this?

CAROL BENSON KENDALL: One evening when I was still in Boston, about three weeks ago.

S.A. GEORGE NOWICKI: Carol Lynn, when we stopped you had started a thought concerning some concerns that your mother had, would you continue with that please.

CAROL BENSON KENDALL: Well my mother indicated that she wouldn't put it past my brother to possibly do away with her.

S.A. GEORGE NOWICKI: This, which brother are you referring to?

CAROL BENSON KENDALL: — My brother Steven. I knew she was scared of Scott, but that was a different situation. I mean I was scared of Scott. But you know we were talking, my mother and I were very very close and we didn't have anybody else except each other because Scott went his own way and Steven since he's been under the influence of of Debby, doesn't have anything to do with my mother any more. But Steven I guess Steven had been taking advantage of my mother and he had, he had, all that seemed to matter to Steven lately was, was using my mother's money and he he wasn't being nice to her and between Steven and Debby Steven wasn't, Debby had all these rules to try and hurt my mother, like she,

124

**CAROL BENSON KENDALL:** she wouldn't ever allow my mother to see the grand-children, which hurt my mother very much. And Steven wouldn't bring them down either. There had been, mother had this company that, that, that Steven had kind of stripped but it was always mother's money that was used, there have been lots and lots of money and he, when my father died my mother didn't have lots of money but she had enough that she could have lived comfortably and not have worried about her old age. One thing my mother had a terrible fear of ending up in a nursing home so it, and so she thought that she had enough there would be enough money that she always to at least have a nurse in the hous And I told her it didn't matter anyway because she could always come and stay with me, and she said that she knew she could come stay with me, that she knew she couldn't go with Steven because Steven had already told her that that if she ever got sick or anything not to call on him, he wouldn't take her in. And Scott he only has his own interests. But my mother was always, all the family always came first and she was always ready ready to (inaudible) Scott everything and she was always doing things for Steven. But Steven was, well he took advantage of my mother and he would get involved in these really big deals and then at the last minute without telling my mother he had already committed himself to it, he'd tell her and he'd get money from my mother, money like $50,000 (inaudible) . And this had been going on for a while and then there was the Meridian Company that my brother had started and there was all sorts of funny things going on about that, and when Wayne had come down last year they had found irregular-ities so to speak that were I guess probably would say was embezzlement but my mother wasn't about to do anything about it at that point. And (inaudible) but they just, he did all sorts of things, it kept getting worse and Steven was moving things to Fort Myers and he never wanted my mother to know anything, or anything. So what had happneed was, all that thing with Meridian was really long and involved but what finally happened was that when we were, Steven, Steven had gone thru about two million, two, two and a half million dollars of mother's money, and since my father had died my mother was really upset because she was afraid that she didn't have enough money left now to even build herself a house. And she was at my house and she was crying because she didn't know how she was gonna come up with the money, she said "I don't even have a house to live in anymore." But she was selling her house in Lancaster which was a (inaudible) house and she didn't know where she was going to come up with the money to build herself a house. And she was really upset about that and then while we were there, we talked about a lot of things, about how she felt and everything. And while we were there we found out that Steven had bought himself a house and that really really upset my mother. As my mother put it, it was the straw that broke the camel's back. She finally was going to do something.

**S.A. GEORGE NOWICKI:** Could you tell me what was discussed at this dinner between the three of you all, if anything was discussed concerning your mom's business responsibilities?

**CAROL BENSON KENDALL:** Well they, we had discussed a little bit about what had, I should say we were continuing discussion, because they had brought up mother and Wayne had of course started to fill me in on things as soon as they got back that after-noon. That they had gone up to Fort Myers that day to chee out my brother's new home and also his company known as Meridian Marketing. And they were making comments first about this huge house that Steven had bought for his, I mean a pool and a tennis court and how they had, I'm not sure at which time, which thing was said exactly because as I said we talked about it before we left for dinner and we did talk about it a little bit after that and in the car, on the way over to dinner. That they told me they were sitting in front of his house, which sat way way back, like a big estate, which a blue 280Z, which Steven

**125**

CAROL BENSON KENDALL: had told them that supposeoiy he had sold to buy the house with and that they, they mentioned that they had confronted Steven at the office, apparently they had gone back to the office after they had been out there, about the fact that this blue car was sitting in the driveway and Steven denied knowing what car they could possibly be talking about. But Steven had recently a habit of being able to do that, of being able to be asked questions directly, Wayne and my mother would ask him a specific question which he would deny completely and like the last time, last year when they had been, Wayne had been down to do the income taxes for the company, when the Meridian Marketing thing first came up. Steven denied that he knew anything about the company like that, no he was not involved. Then of course he was involved, about 15 minutes after this conversation even went on somebody called from that company asking a question and it just wouldn't phase him, I mean he wouldn't say gee I'm sorry I really was involved in something, he just was as though it hadn't happened, but that's (inaudible) But, so they had mentioned, you know they said that they had mentioned to him about the, the blue Z sitting in the driveway, you know he acted like he didn't have any idea who's car that could possibly be.

S.A. GEORGE NOWICKI: Is that what your mom had told you at dinner, or Wayne or both of them had said or on that day had they stated this in front of you?

CAROL BENSON KENDALL: Yes. They were kind of filling me in on what had happened because what, Wayne had arrived on Sunday and the reason that Wayne had come down, not only where they were going to do the income tax but my mother had Wayne come down because Steven had been diverting funds from the company in various ways and there was money missing and checks missing and and my mother being a very devoted mother had as much as possible over-looked many things and had been carrying the tremendous losses and hundreds of thousands of dollars over the years that Steven would incurr and she was going to pick up the pieces but when she was up in Boston and she found out about the house, Steven had never made any attempt at all to pay mother back for anything. And he had gone thru, well my mother talked of figures like two and two and a half million dollars that he. Because I guess when mother was up here and she found out about the house she just completely that, she said that's it, that's the straw that broke the camel's back. I'm just not, here I'm worrying that I'm not going to have..my mother talking, that I don't know where I'm going to come up with the money to build my own house and here he he's gone out and bought this himself a house.

LT. 'L. WAYNE BRAHAM: Excuse me, when when that occurred, your mother was here in Boston with you. Approximately what was the date?

S.A. GEORGE NOWICKI: We understand you came back on June, July, June 28th, so it would be sometime prior to that.

CAROL BENSON KENDALL: Well let's see, it would have been probably about ten days before that because mother called Wayne right away and Wayne said the earliest that he could get down would, would be the Sunday that he came down.

S.A. GEORGE NOWICKI: This was early in her return from Europe, like sometime the week of June 16th or so.

CAROL BENSON KENDALL: Right, probably would have been I would think that week. Then she became, I wouldn't say irrate, my mother just was not never that kind to become irrate, that wasn't, she was so mild mannered and lady like and diplomatic that irrate is not exactly a word that would connect with my mother, but she was as I say extremely distressed. And she said that that was the straw that broke the camel's back, and that something was going to be done. And she had questions for quite a while as to whether they were

126

**CAROL BENSON KENDALL:** going to close down Meridian anyway. Because, mother was just pouring money into, pouring money into it and Wayne was kind of advising her that you know perhaps she should stop putting the money in because if it wasn't helping her from the financial stand point then it, they. were just throwing money away. So, but at this point mother decided that, oh and also she had been trying to get together and had been collecting for a while records of the different projects that Steven had involved her in, that she had these tremendous losses in. Now when I say Steven involved her in, Steven would do things like he would, he would never consult my mother on anything, he didn't want her to know anything but he would get some huge project going that maybe involved $150,000 and he'd have it committed and the thing signed and then he'd shell, you know drive over to my mother's and say "I need $150,000."

**S.A. GEORGE NOWICKI:** If during the middle of June she had come to this realization that something had to be done, to your knowledge did she talk by telephone with Steven and express anything to Steven about her disatisfaction?

**CAROL BENSON KENDALL:** Oh no, she was, she, she did casually say "Oh, Steven I understand you got a new house." and it was just that sort of thing, my mother said absolutely nothing to Steven at all about what she had planned, she was very very careful about it because she wanted to get kind of all the goods on him and just, I mean she was really upset, and I'd never seen my mother really that upset about anything before, so she had called Wayne and she told Wayne you know: she wanted to make a decision about. closing the company or not closing the company. And she also told Wayne that she wanted her, some of her money back and if it meant putting up a lien on the house, on that house of Steven's and on anything that had to do with Meridian Marketing or whatever, she wanted to start getting some of her money back because, because she had reached a point where she was really getting distraught in the thought that she was, she was going broke. I mean she had a nice income that would have kept her for her lifetime and allowed her to live comfortably. My mother had a terrible fear of nursing homes and one of the things that she had wanted to be sure of was that she had enough to if something became wrong with her that she could remain in her own home and have a nurse and all, and she had over this period of time watched Steven just go thru money in terms of $50,000 and $150,000, we're not talking little tinney but huge big amounts and some of the things at the time I didn't know about but you know mother ended up filling me in on pretty much everything. I was not aware really as to the complete extent of how much money was involved until the time really when she was up in Boston and of course being more upset she was kind of throwing out more figures where she was talking about two and a half million dollars and you know figures that were just I was just kind of sitting there just, I couldn't understand doing the things to my mother that my brother was doing anyway. I couldn't imagine doing those things, I was kind of, just the whole concept was not my sort of thinking but I knew she was upset and the idea was that Wayne was to come down and they were going to collect, Wayne was going to go thru all the bank books and he was coming down to do the income tax and that that was kind of the cover, I mean he was going to do the income tax to, but that was maybe sort of the cover for going thru all the books, and all the check books to try and start to find where all the money had been going to. Because Steven had been confronted the year before by Wayne and my mother with the fact that he was embezzling money from my mother and Wayne had even pointed out to Steven that if mother wanted to she could put him in jail. And I think the idea was to, I guess to kind of shake him up and maybe he'd straighten out because of course my mother wouldn't at that point

**127**

CAROL BENSON KENDALL: anyway have sent Steven to jail. I can not honestly say at this point she wouldn't have because with the, the family situation the way it was, where she was not, it wasn't like it was a close family situation anymore because of my sister-in-law who I won't go in because her about her if you wish.

S.A. GEORGE NOWICKI: Yeah, let's go into her in just a little, in a little while.

CAROL BENSON KENDALL: Alright, my mother had been kept, had been pretty well shut out from Steven and his family. And of course she wasn't allowed to really call there even in an emergency, a couple of times she would try to get thru and Debby would slam the phone, and she wasn't suppose to disturbe Steven anytime on a weekend or an evening. And she hadn't really seen anything of the family and was not permitted to see the grandchildren whatsoever. |And so I think it had reached a point where I can't say for sure that my mother would have put Steven in jail, but my mother was intent on making sure that Steven had to sell his house and sell any automobile and sell any interest that he had in Meridian Marketing, in order that he pay her back some of the thousands of dollars that he owed her.|

S.A. GEORGE NOWICKI: When do you think she would have told Wayne Kerr that this was her objective? When do you think Wayne Kerr would have been first aware that this was going to be her objective?

CAROL BENSON KENDALL: I heard, she told, as far as I can remember she discussed this with Wayne on the phone from my house.

S.A. GEORGE NOWICKI: Early in the week of June the 16th, quite possibly?

CAROL BENSON KENDALL: |Yes. And they made the plans for Wayne to come down because mother explained to Wayne how upset she was about it and that, that I think the terms were that she used that putting a lien on the house or something like that. That she, she wanted some of her money back and it just wasn't fair anymore that he had taken all of that and now she wasn't going to be left with anything and she wanted Wayne to come down and and start, and go thru all the check books because although my mother is a very, was a very very brilliant woman she had had no business experience.| She had been very, my father took care of everything and it was that sort of a situation. And it was Wayne had, took care of the taxes and he had been the one who had come down before and tried to make sense of the books, because infact they even found check books the year before that they didn't even know existed because |Steven would open all these accounts and he'd shuffle, things from one account to the other account and then checks and there were these three checks that they, that they were still trying to figure out where they were that at least they were suppose to be deposited in the bank, I know this had been going on for a while, Steven was suppose to get it straightened out. The third one still hadn't been straightened out yet and now there were, whether they found out about the checks when they arrived or not there were two more checks that were written while my mother was away that they didn't know what they were for. And they were trying to figure out what those checks were and how much they had been written for.|

S.A. GEORGE NOWICKI: How did your mom find out about those two checks that were written when she was in Europe?

CAROL BENSON KENDALL: Well see my mother had left some checks I guess made out, there were a couple of companies, there was the Meridian World Group, which was I don't have all this completely straight because it was down for tax purposes like one was the one out of one company and all the payroll taxes were suppose to be paid and it, that company then supplied Meridian Securities was a subsiderary of it then. I don't understand

128

**CAROL BENSON KENDALL:** all this stuff but it was ＿rked with different check books.

**S.A. GEORGE NOWICKI:** How did she become aware..

**CAROL BENSON KENDALL:** She had written, she had written the checks and so that there could be money that could be transferred over, in-fact ＿ey might have been Dean Witter checks that she had left made out to the ·Meridian World Group that could be deposited so that the payroll could be paid while she was gone. So it was those checks that they, they couldn't find.

**S.A. GEORGE NOWICKI:** When did they know it, how early did they know it to your last recollection? Was it while you were in Boston or after you came to Florida?

**CAROL BENSON KENDALL:** It might have been while I was in Boston, but I couldn't swear to it.

**S.A. GEORGE NOWICKI:** O.K.

**CAROL BENSON KENDALL:** Because I think after mother got back she might have asked Steven over the phone whether there had been enough money because I know one of the things that there had been one check that we had to write to put a deposit on a chandelier that mother wished to purchase from a decorator in Miami. So I had had, she had had Steven write out this check but how many checks she left behind and all that I didn't know exactly but I did know that they were talking back and forth and I could·hear mother talking to Wayne on the phone because I'd be right there, that there were these two checks that were missing. And now since my mother's death I have since found out how much those checks, two missing checks were because Wayne happened to tell me that they discovered · how much they were, one being for $50,000 and one for $25,000 But as is, but on the Monday, getting back to the Monday what they were doing was since I didn't go along with them and I was in on what was going on they were kind of filling me in on what had happened in Fort Myers and what happened when they went to Meridian Marketing and how Steve Hawkins had acted and what sort of questions, Steve Hawkins was Steven Benson's partner in this Meridian Marketing thing which Steven had very carefully made sure that my mother didn't have anything to do with. And all the Meridian companies you see my mother had put money up for, and Wayne had insisted that my mother was the sole stock holder, well that infuriated Steven that she was involved with that so right from the start I figured that he had planned that he would get this other company going and little by little had been funneling money up in there. Because there were things being done like tel..., we were asked, he and Steve Hawkins were taking each other's telephone calls for example, we would take Steve Hawkins calls, now why, it was like why in the world should we be taking his calls, he lives in Fort Myers and well that was so we could use his office as our office for Meridian Security. I mean there was always an excuse why this was being done. But then mother found out things like they had used my, Steven had used my mother's VISA card to buy a very expensive desk chair for Meridian Marketing and they were, now, how much Steve Hawkins knew about anything I don't know, he did make a point of saying to to my mother and to Wayne somewhere in the conversation that of course he and Steven were the sole owners of Meridian Marketing. I took that to mean that he was telling them that he, that they didn't have anything to do with it.

**S.A. GEORGE NOWICKI:** Go ahead and continue Carolyn if you would.

**CAROL BENSON KENDALL:** Wayne and my mother both indicated that they, in our conversation of course we talked before we went to dinner and while we were at dinner for a while, that you know they didn't you know say anything while they were at Meridian Marketing to indicate to Steve Hawkins as to why they were there. Of course, I apparently the people in the office in Naples knew where mother had gone but they hadn't said anything to Steven because what, Steven

**129**

CAROL BENSON KENDALL.

called home on Monday, around lunch time, and said "Mother there?" I said "No.". I mean I figured I knew where they went but I played dumb. And he said "Well do you know where they went?" and I said "No." and he said "Do you know when they're suppose to be back?" "no." I said "Why, do you need them?" he said "Oh, I have some appointments and I, you know, I did not want to be here." and I said "Well why don't you just leave a list where you're going to go." that was kind of like a little dig because Steven was always going off and never telling anybody where he was going, particularly my mother, even though it was suppose to be a work day he would be gone somewhere in the middle of the day and she'd say, he never would tell her what kind of an appointment or anything else so, I couldn't help adding that little bit of you know, why don't you leave messages where you're going. He said "Well she could always meet me." and I said "That's true, why don't you leave a message anyway." but so apparently. So then we hung up. But mother said that evening when we were all talking that because I had told her that Steven had called, they asked me whether Steven had called at all, and they said that the people in the office all knew where they had gone but that none of them apparently had told Steven where they had gone. The other people in the office from what I understand from what mother had said were getting a little bit fed up with Steven themselves because he was what they felt sherking his responsibilities as a member of the working team and he was always off on one of his own things and letting the company slide which was a disadvantage to them. So they I guess for their own reasons didn't tell him but I remember saying at the time "Well mother I feel sure that the minute that you walked out of there that Steve Hawkins got on the telephone and called and told:Steven that you had been up there." The fact that he had been so nervous then it just, I don't know I had just figured that he probably would, that seemed like the logical thing for him to call and tell Steven that his mother and his attorney bad been up there. But so, at dinner and before dinner they were telling me about the house and that they had mentioned to Steven about the blue car sitting out in front of the house and of course they told me about what the house looked like and that there also was a truck, a panel truck that was sitting up by the house which they felt sure was one of the Meridian trucks that was putting an alarm system into Steven's new house, estate probably would have been more like it according to what my mother said, there was so much land involved and everything. She said that the yard was so big that it made the tennis court look small, I think that was the way she phrased it. And you know they didn't, they had mentioned that they had let Steven, they had let Steven know that they had been out there and they did question him about whether there was a lease on this space that Meridian Marketing had because it, it's apparently in a new building and I think the figure that Wayne said was it was some- thing like and I think he happened to mention that it was like 2,500 square feet, I think that's a big amount, but it was a great big huge amount and it was supposedly they were renting it from somebody else and then they were going to be leasing out to other people. But Steven told them that, well there wasn't, that he was renting it but there wasn't any formal lease, that they were renting it. So, I guess that's, I think that's pretty much all we talked about at dinner, they were just filling me in on, on the house and what they had done at Meridian Marketing.

S.A. GEORGE NOWICKI:

When your mom and Wayne came back from meeting with Steven that afternoon down at Meridian Security, after they had been to Fort Myers, and then they had this meeting where they told Steven they had seen the automobile up there, to your best recollection what time would your mom and Wayne have gotten back to:the house? You said you went to dinner early.

130

■■■■■■■■■■
■■■■■■■■

**CAROL BENSON KENDALL:** It was, it was fairly early it must have been fairly early, it wasn't real late because we, because we went out for dinner kind of fairly early, but they were kind of, I don't know quite how to phrase this like two little conspirators who were kind of you know, it was becoming I don't mean to say a game because it was much more serious than a game, but it was like a plot thickening you know, we're getting all these little things that and we're drawing the net in and that of course the next thing was to start in on, Wayne was going to be starting in on the check book part. But they had you know made it of course, confronted Steven with the Meridian Marketing situation and of course there was the questions with the Meridian Marketing thing about the chair that was owed and Steve Hawkins had a beeper which had been charged to my mother. And she wanted to be reimbursed for it, well Steven, our Steven said that he, we had been reimbursed for it. Mother said she never believed that and there was some other things that they had bought for the office up there, but as far as I know they didn't stay to late at the office,

**LT. L. WAYNE GRAHAM:** That was, excuse me, was there any indication that they, either by Wayne or your mother, that Steven had any inclination or indication that something was amiss?

**CAROL BENSON KENDALL:** Oh I think, I would say definately we all knew that Steven knew that something, that I mean when Wayne comes to go over the books for one thing and my mother several times even before we got down to Naples had commented, had made comments, about Steven being a little nervous about things. Even though she purposely made sure that she didn't make any indication to Steven at all about why she was having Wayne really come down. And Steven exhibited like on Monday with calling and checking where are they, and all this sort of thing, he was nervous, I mean he, he had, we knew that he knew that they were there and it was just going to be a matter of time, particularily after my mother had been up at the house and actually up at the Meridian office. Again I guess one would take it as an assumption but Steven had exhibited a little bit of nervousness, he had called the first thing in the morning about the, when are they coming and have they left yet, and why aren't they here yet.

**S.A. GEORGE NOWICKI:** This was the morning of July 8th?

**CAROL BENSON KENDALL:** This was on July 8th, because of course Wayne had gotten in the night before, and so they had talked about business and I know on Tuesday night my mother had planned to that Tuesday was I guess they were really going to start getting into the technical things because she had made a comment about the fact that Steven would have to be late getting home for dinner or something like that, because they were really going to start getting into the paper work.

**LT. L. WAYNE GRAHAM:** He said "I'm going to go out and get coffee and donuts." Is that a normal thing for someone in the household to go out and get coffee and donuts?

**CAROL BENSON KENDALL:** No. But whether it's a normal thing for Steven to go out and get coffee and donuts, I don't know. See he doesn't, he's not there very often. I mean as far as the coffee is concerned, my mother always has her coffee first thing in the morning, and Wayne had already had a cup of coffee, my mother has one of those hot water things that hooks right up to the spring water. So they just made their own coffee so, and I'm not sure whether Marty is even a coffee drinker, so it would not have been a routine that we all went out to get coffee. I'm trying to remember other times when maybe we had been some place where

131

CAROL BENSON KENDALL: Steven had been and Steven went out and got coffee, because there wasn't coffee there we were, you know in a way I guess it was st .ge for him to go out and get coffee, to go out and get the coffee for us because he could have walked in the kitchen and gotten coffee. I, now as fas as the donut part I don't know, Imean he didn't, it wasn't like there wasn't coffee in the house. He could have walked in and said "I'm dying for a cup of coffee." and he could have gotten a cup of coffee. But I think there have been times when we were at other places where we were doing something and maybe coffee wasn't available, Steven would have to have his cup of coffee first thing in the morning sort of thing.

LT. L. WAYNE GRAHAM: Did your, was your mother concerned that she wanted Scott to go along that morning?

CAROL BENSON KENDALL: Not that I can think of.

LT. L. WAYNE GRAHAM: How about yourself, were you wanting Scott to be there that morning?

LT. L. WAYNE GRAHAM:
CAROL Benson Kendall I thought it was dumb. Scott doesn't particularly like to help and Scott doesn't particularly like to get up early in the morning, if he doesn't have to. And Scott could be a miserable SOB if he's having to do something that he doesn't want to do. Oh, I couldn't really, my feeling about having Scott go along was, I didn't really see what, I mean what good he was going to be anyway because what I wanted to do was to have Steven hold one end of the tape measure and then I would walk thru the woods the number of feet that I had figured out on the plan and we would put the stake so I could figure out because it's a curved piece of property, you just can!t do it like a square and you had to walk thru the woods in different places, so I didn't really see where Scott was necessary in the first place. It was Stephen's suggestion that we had Scott to go along.

LT. L. WAYNE GRAHAM: If you can recall, where there any occasions where Steven and Scott wore dark sunglasses? Do you recall?

CAROL BENSON KENDALL: Dark sunglasses, well Steven wore glasses so I don't, I don't think of Steven as wearing sunglasses at all. And I think Scott's sunglasses were those more fashionable kind, the different color sort of things. But Kim, Kim would know better than I did. The darkest pair I guess was the ones that I had, I keep the Blair House.

LT. L. WAYNE GRAHAM: What about Scott or Steven wearing like the ball cap type, cap with with the bill on the front, the plain, you know like a navy blue? How about Steven?

CAROL BENSON KENDALL: No, I only say that because the other day when we went out to look at the lot, it was so terribly hot and I always have to have my hat, my head covered because of the sun and I remember that Steven was so terribly hot and I, I made some comment to Steven about why didn't Steven wear a hat to help you know with the heat and the sun, and he had, he gave some reason as to why, hats made him hotter or something like that, but indicated that he never wears hats even to keep the sun off.

LT. L. WAYNE GRAHAM: Specifically, what I'm reaching out for was there any indication that after going over to the property that they were going to, your mom and Wayne Kerr, were going to the office and were specifically going to do something that day business wise? Were they going to start the books or that type of thing?

132

**CAROL BENSON KENDALL:** Oh, definately, I mean there was no question that the, that infact my, I guess mother and Wayne would have gone on themselves already if Steven hadn't said to my mother "Oh, I want you to go to." I mean mother hadn't planned to go over...

**LT. L. WAYNE GRAHAM:** To the property?

**CAROL BENSON KENDALL:** To the property, it was Steven who said "Oh, mother I'd like you to go over to." and she I think she said "Why?" and he said "Well there's some things that I need for you to see." Then at that point of course we got into this discussion about the swimming pool because Marty said "Mrs. Benson, don't forget the pool man is coming."—insert from statement

**LT. L. WAYNE GRAHAM:** And uh...

**CAROL BENSON KENDALL:** She and Wayne were planning on even, when we went over to the lot, to either start on things right there at the house and I think one of the things that they were planning on doing that day was the check books, because I remember that mother had asked, mother or Wayne and I don't know which one, had some, had asked Steven about certain check books, and Steven said that he had them at home and he'd have to bring them in and then some of them he still hadn't found yet to bring in. So I think they were planning on doing check, starting on you know it was something to do with check book that they were going to do that day.

**S.A. GEORGE NOWICKI:** O.K. Let me ask you this, do you have any idea who may have paid the premium's on these policies, or where the money would have come from?

**CAROL BENSON KENDALL:** I would say that, as far as the trust was concerned we each got some money and first we only got $10,000 a year but then I was having so much trouble financially that my grandfather upped it so now we get, I think it's $32,000 a year because Steven was suppose to be her business manager and handle all the insurance and as well as, as working in the Meridian office. Now I know that that money she had stopped paying him because she was using that, putting that money towards money, some of the hundreds of thousands of dollars that he owed her. He only, as far as any other outside income, the only thing that we all could figure was that it was basically by mother's money, that Steven was embezzling money in all sorts of ways and utilizing it for his own benefit because Steven wasn't the kind to, Steven didn't gamble and he didn't drink and he wasn't the kind that ran around with rough characters or anything and I really wouldn't feel as though Steven was into drugs and I know my mother felt that also, that that's one thing that would never have been something that Steven would have been involved in. He was the kind, he was always thinking in terms of grandos schemes, I mean if he opened a company it couldn't be the John Smith Pencil Company, it had to be World Wide Industries. And every time he, and he couldn't have a printed card it had to be the thirty kind, the thirty dollar piece embossed kind, Imean that was just the way Steven's mind ran around things. As far as the money it, I would say it was my mother's money, everything was my mother's money.

**133**

17. Your Affiant was advised by Agent Frank Kendull, the Laboratory Technician, Fingerprint Expert for the U.S. Treasury Alcohol, Tobacco & Firearms that the receipts from Hughes Supply Company that were delivered to the U.S. Treasury Alcohol, Tobacco & Firearms Laboratory in Atlanta, Georgia for latent fingerprint analysis, were found to have matching latents. The one receipt was dated July 5, 1985, the second receipt dated July 8, 1985. On July 5, 1985 and July 8, 1985 the sales clerks for Hughes Supply Company were different on each sale.

18. Your Affiant upon receiving the knowledge aforementioned in paragraph seventeen (17) gives cause to Your Affiant to believe we must have the rolled ink impressions of the fingers, palms, writer's palm of both hands from the body of Steven Wayne Benson, it is imperative to eliminate or confirm that the latent, prints found on the receipts from Hughes Supply Company must be compared to further this investigation to a successful conclusion. Investigators assigned to the murder investigation have made numerous attempts to obtain rolled ink fingerprints of Steven Wayne Benson from other sources, both civilian and military, all with no success. Also, the normal set of inked fingerprints would not contain prints of the palm and writer's palm necessary to this investigation.

WHEREFORE, AFFIANT PRAYS that a Search Warrant be issued commanding the Sheriff of Collier County, Florida, the Sheriff of Lee County, Florida, and Joseph P. D'Alessandro, State Attorney for the Twentieth Judicial Circuit, State of Florida, and their Deputies and Investigators in Collier County, or Lee County, Florida, with the proper and necessary assistance to take the rolled ink impression of Steven Wayne Benson's fingers, palms, writer's palm, of both hands, being in Collier or Lee County, Florida, making rolled ink impressions of Steven Wayne Benson's fingers, palms, writer's palms, of both hands, in the daytime or in the nighttime, as the exigencies of the occasion may demand or require, and upon the taking of the above described rolled ink impressions of Steven Wayne Benson's fingers, palms, writer's palm, of both hands, to seize the impressions as evidence.

LIEUTENANT HAROLD YOUNG
SUPERVISOR OF CRIMES AGAINST PERSONS UNIT
COLLIER COUNTY SHERIFF'S DEPARTMENT

SWORN TO AND SUBSCRIBED before me this 16th day of August, 1985, A.D.

JUDGE HUGH D. HAYES TED BROUSSEA
CIRCUIT JUDGE OF THE TWENTIETH JUDICIAL
CIRCUIT IN AND FOR COLLIER COUNTY, FLORIDA

134

ALBERT W. GLEASON
TRAINING AND EXPERIENCE

1946-1948

I received my initial training in explosives and explosive device technology while in the U.S. Navy. During this time, I served as a bomb disposal technician and powderman.

1948-1950

I served in the Navy Reserve and was assigned as an instructor.~~in~~ explosives use and technology.

1950-1952

Recalled into the Navy, and served as a powderman.

1953-1973

Served with the New York City Police Department. Assigned as a detective/technician to the bomb squad. My duties included the disarming and safe disposition of all types of explosive and incendiary devices as well as the investigation of explosive and incendiary incidents. In addition, I also served as a training officer.

1973 to Present

Employed by the Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms in Washington, D.C. I am an Explosives Enforcement Officer assigned to the Explosives Technology Branch, Office of Law Enforcement. My primary duties include the technical investigation of accidental and criminal fire and explosion sites. In addition, I review and examine investigative reports, laboratory findings, photographs, exhibits and physical evidence relating to explosive and fire incidents to determine the cause and origin of the explosion and/or fire. In cases involving explosive or incendiary devices, I prepare a statement of findings which includes specifics and/or opinions relative to the device type, design, construction, functioning and effects. I also serve as a training officer.

Professional Training

From 1948 to the present time, I have prepared and taught courses at many schools, training sessions and seminars relating to explosive/incendiary device technology, military, commercial and improvised explosives, and manufactured as well as improvised fuzing and firing systems. In addition, I have attended many such schools myself during these past 39 years.

135

**Professional Associations**

International Association of Bomb Technicians & Investigators
International Association of Arson Investigators

**Inventions**

Co-inventor and patent holder "Bucky X-ray and floroscopic detection system."

**Publications**

Training publications - New York City Police and ATF

Fire Investigation Handbook - Technical Reviewer and Contributor

"Arson, A Technical and Legal Guide" - Co-author and Technical Reviewer.

"The Handling, Transportation and Destruction of Explosives and Hazardous Material" - Co-Author and Technical Reviewer

"X-Ray and The Forensic Sciences" - Author

**Court**

I have testified as an expert witness regarding explosive and/or incendiary devices in Federal and State courts in excess of 100 times.

Albert W. Gleason

Sworn to before me this 3rd day of September 1985.

Janice R. Andrysiak, Notary Public
Anne Arundel County, Maryland

My commission expires July 1, 1986